Ms. Speer. May it please the court. My name is Kendall Speer and I represent the appellants in this case, 18 individuals who have suffered from chronic Lyme disease. Medical society should not be immunized from liability when they publish treatment guidelines that they know are false, when they punish doctors who deviate from those guidelines by reporting them to state medical boards, and when, as here, the falsehoods in those guidelines result in grave physical injuries. The district court erred when it held that the Infectious Diseases Society of America's guidelines are not actionable and its order granting the IDSA's motion to contained in the guidelines are actionable, whether those statements are considered false statements of fact or misleading statements of medical opinion. Second, because regardless of which state's law applies to the plaintiff's common law misrepresentation claims, no direct reliance is required for the plaintiff's claims to survive. The reliance by the plaintiff's doctors is sufficient to state a claim because such reliance was foreseeable and it was specifically intended by the IDSA. And then finally, none of the other procedural grounds which were not addressed by the district court support affirming the district court's order. The IDSA holds substantial power in setting the generally accepted standards for diagnosis and treatment of Lyme disease in the United States and it does this in large part through the promulgation of its guidelines that are at issue in this appeal. The guidelines also play a huge role in shaping access and availability of health care because the guidelines define what is going to be covered by health insurance. It is because the guidelines deny the existence of treatment failure in chronic Lyme and because the guidelines require a positive serological two-tier test to diagnose Lyme that the plaintiffs in this case suffered severe physical harm. The district court granted the IDSA's motion to dismiss on the sole basis that the guidelines do not contain false statements of fact. And that brings me to my first issue, is that the guidelines are actionable. And in considering whether the statements in the guidelines are fact or opinion, this court should not parcel isolated statements in the guidelines or isolated disclaimers or qualifiers and consider those statements in a vacuum. Rather the court should consider the overall import of the statements in the guidelines, the overall message that is being communicated to the doctors to whom these guidelines are targeted, considering also how this information is presented in the guidelines and then interpreted and applied by the medical community. And if the court looks at the statements that we've included on pages 8 through 11 of the chart in our brief, the court can see these statements that are included throughout the guidelines as well as the context within the guidelines. How these statements are summarizing various topics and various studies and then also consider that against the context that we have alleged in our complaint, which is how these guidelines are highly influential and how doctors can treat their patients. And so, again, considering that fuller context should result in the conclusion that these guidelines are fact. And where the district court particularly erred in this case is in its conclusion that the plaintiff's doctors are equally capable of reviewing the papers and the studies cited in the guidelines and then making their own independent assessment about whether the conclusions that were reached by the IDSA were accurate. Because as we have alleged in our complaint and as such allegations must be taken as true in a 12B6 context, the plaintiff's doctors are not sufficiently capable of exercising their own independent judgment because of the substantial power and influence that the IDSA has in defining the parameters for how doctors can treat their patients. And it's that fact which makes the guidelines... So if you sued an individual doctor for medical malpractice, would the doctor have a defense? That, well, I wasn't exercising any judgment at all, I was just following guidelines? I think that if the doctor who was treating a patient within the confines of the guidelines, I think that they could rely on the fact that they're relying on those standards. But because these standards are so accepted by insurance companies, I think that the doctor... I think the defense would be acceptable then that the doctor... Did you sue doctors in this case? No, Your Honor. Doctors were not sued. Originally, the IDSA panelists who authored the guidelines were included as defendants in this case, but the claims against the individual panelists have since been dismissed. But the claims against the IDSA is the claim that is still at issue. And so, no, the plaintiffs did not file suit against the doctors who refused to treat them outside of the parameters. Who else? Did you sue the insurance companies? Yes, Your Honor. And you allege RICO? Yes, Your Honor. And have those gone? Yes, the plaintiffs settled with the insurance company defendants. And so after those claims were resolved, the plaintiffs learned of additional information specifically relating to the knowledge component of the misrepresentation claims. And that is when the plaintiffs amended their complaint, timely asserting the misrepresentation claims that are at issue in this appeal. Well, so because it seems to me it's one thing to say there's some kind of collusion between the organization and insurance companies, and it's some kind of conspiracy or whatever. And another thing to say, well, what the body is doing, the IDSA, is a misrepresentation of fact. I mean, who are they misrepresenting? Who is the audience for the representation? The audience, as they're well aware, are the doctors who are treating Lyme patients. And they know the doctors are relying on them as setting these acceptable standards. And so when they are promulgating this information and also cultivating the responsibility to promulgate this information, there should then be a higher duty upon this organization to... Okay. What's your best case? I mean, I'll tell you, my concern here is there has to be a forum for debating scientific questions. And this is a scientific question. How do you treat this? Right, Your Honor. There has to be a forum for that, and we can't have lawsuits against people who are debating a scientific question in a forum. So, I mean, what's your best case that this kind of statement in this forum can be the subject of a misrepresentation consistent with the First Amendment? Yes, Your Honor. Well, there's two cases I want to bring to the Court's attention. The first case is a decision, a recent decision from the First Circuit, and that's the case of Conformis v. Aetna. It was not cited in our brief, but the citation for that case is 58 F. 4th, 517. Well, what year was that case from? 2023. Okay. Did it come out after your brief? It did come out before the brief, just about a week... You should file a 28J, but that's... Okay. I can certainly do that after the argument, if you'd like, Your Honor. But what the First Circuit held in that case is that statements that would otherwise be matters of scientific opinion could be considered facts and therefore objectively verifiable and actionable if there is already a consensus within the relevant scientific and medical circles regarding the effectiveness of a particular product or a particular procedure. And what was at issue in that case was a product for a total knee replacement, and Aetna decided to change the characterization of that product under its policy to something that was labeled as investigational and experimental. And, of course, that resulted in the product not being covered under a number of plans. But the product had been on the market for several years. It had been used by orthopedic surgeons and other doctors with... Who was making the statements in that case? Aetna, the insurance company. Okay. And she sued the insurance company? Or somebody sued... In that case, the plaintiff, the manufacturer of that product, sued the insurance company. Well, that's an entirely different question than attributing to a group of professional scientists actionability for what you suggest is errors. Right. Right, Your Honor. But the question... Yeah. What the question that the court was looking at, though, is can these statements be considered fact or are they scientific opinion? The same question... Yeah, but they were interpreting under the terms of policy, right? Under the terms of the policy, yes, Your Honor. But the court was noting that those, that clinical judgment regarding the effectiveness of this particular product was, could that clinical judgment then be actionable? And that's essentially what the IDSA is doing here. It's making a clinical judgment and it is stamped chronic Lyme as something that's investigational, it's experimental, and it's something that should not be covered by insurance. But as we have alleged in our complaint... Do they say that it shouldn't be covered by insurance in the statements we're talking about? No, Your Honor. They don't go so far, but they do question the existence of this particular condition and make it very restrictive for doctors to be able to diagnose it. Is that case a 12B6? The conformist case? Yeah. Yes, Your Honor. Yes. Is the 12B6 based on policy language? Yes, Your Honor. The court was considering the statements based within the policy language, but also... Isn't that a huge difference between what we have here? I mean, there are a whole bunch of rules about construing policy language as opposed to statements like here. Right, but I think, Your Honor, the court was looking at the language in the policy and just considering whether or not that language was science... It was based on the same defense, I guess, that scientific opinion cannot be considered fact. And I also want to direct the court's attention to this court's decision in Eastman Chemical Company versus Placibure, because I think that that case is applicable here in support of the plaintiff's position, because in that case, this court held that false commercial speech was actionable under the Lanham Act, even when that speech was making scientific claims. And what the court noted with regards to the sales brochure in that case that the court found could be actionable was that in that sales brochure, there were scientific statements that were made without the necessary context that would be presented by a full scientific study, and such as an explanation of the experimental methodology, full disclosure of conflicts of interest, explanations of differences between the raw data and the conclusions cited by... Well, what are the misrepresentations in this case? In this case, Your Honor, it's... How do they line up against the case you're citing? Right, Your Honor. The misrepresentations in this case are that if a doctor wants to diagnose chronic Lyme, they must have a positive test to do so, and that the misrepresentations also question the existence of chronic Lyme at all. And again, it goes back to our argument, Your Honor, that we're not saying that the court should look at specific statements in the guidelines, but rather look at the overall message. And if the court... I don't think that's the basis for negligent misrepresentation at all. You have to have — you've got to be able to point to something tangible that the reader would look at and then make a mistake. Yeah. Well, Your Honor, I'll point to just a couple of places in the guidelines where this is clear. This is on page 1094 of the guidelines, and it's in the executive summary section discussing post-Lyme syndrome, which is what the IDSA refers to as chronic Lyme. And there, the court — I mean, there, the guidelines say that there is no well-accepted definition of this syndrome. Whatever definition is essentially adopted, having once had objective evidence of B. burgdorferi infection must be a Psyquanon. So in other words, you must have a positive test to diagnose this particular condition. And then also in that same section, the guidelines state there's no convincing biological evidence for the existence of symptomatic chronic B. burgdorferi infection among patients after receipt of recommended treatment regimens. It's also telling, too, there's a table included in the guidelines. It's table three, but it doesn't tell the doctor, don't treat the patient. Well, Your Honor, it's — How can — I mean, what misleads a doctor about that when you say there's dispute in the medical profession? That means the doctor has to use his or her judgment, doesn't it? Well, Your Honor, but considering those statements against the context in the medical field and these — how doctors are treating patients, and also the fact that the IDSA goes so far to report doctors to state medical boards who do not treat patients within the confines — There was a big flap about — I think it was chronic fatigue syndrome, or at some point, or the consequences of Guillain-Barre. I think that was disputed. I could be wrong about that one, but anyway, there have been several different conjuries of symptoms that people have related to diseases, and then the medical profession says we're not positive about that. So you wouldn't dispute that you have a positive test that connects with some marker for Lyme disease, and then the doctor knows, right? What's wrong with advising that? Your Honor, what's wrong with that is because the IDSA knows that those tests are unreliable, that those tests give false positives, false negatives, and so by saying — What tests give false positives, false negatives? Do the scientists say they give so many false positives and negatives they're not reliable, or is that what your burden of proof is going to be? Well, that is what was discovered, which resulted in the plaintiffs asserting these were — these tests were problematic, yet that's not reflected anywhere in the guidelines, and we allege that in our complaint, that these guidelines have such a pervasive effect in how Lyme can be treated, and that's also reflected in the record if the Court sees the 2020 report to Congress for the Tick-Borne Disease Working Group. In that summary, I believe it's on page 69 of that particular report, that the working group explains the problem with these IDSA guidelines and how restrictive they are to doctors' ability to diagnose and treat patients, and how they are — the set of guidelines that are relied on by the CDC, insurance companies, and how that is — what states are looking to whenever doctors are — when IDSA is involved in reporting doctors to medical boards. And so that's the distinction between the cases where the courts do find that these are scientific statements, like the Pacira bioscientist case that was also recently decided by the Third Circuit. That case is distinguishable because in that case, the Court noted that doctors — that those statements which are directed to doctors and researchers, they're free to accept or reject those conclusions, and that's why those statements weren't actionable. But the statements that we're dealing with here in these guidelines are distinguishable on that basis because doctors aren't free to choose to accept or reject the guidelines because of the substantial control that the IDSA has in, again, setting these treatment standards. And also, going back to Eastman, this case is like Eastman because, as we have alleged, in both instances, you have an incentive to induce reliance on these scientific statements for the purpose of enhancing a bottom line. I think that motivation was easy to see in Eastman, and it is more difficult to see in our case with regards to these guidelines that do purport to be voluntary, that do come in the form of a free publication, but we've adequately alleged in our complaint that they are not, in fact, treated as voluntary and that there was an economic incentive in the drafting and the promulgation of them. I see my initial time is up, so I'll reserve my remainder of time for questions. Okay, we have time for a vote. Mr. Dunn. Thank you, Your Honor. May it please the Court, Alvin Dunn from Pillsbury-Winthrop-Shaw-Pittman representing Apelli Infectious Diseases Society of America, IDSA. Your Honors, plaintiffs brought this case in 2017 alleging that IDSA and the doctors who wrote the guidelines, they didn't conspired with health insurance companies to write false guidelines. They alleged RICO antitrust claims. The plaintiffs got three years of full discovery. They found no evidence to support their RICO claims or their antitrust claims. At the very end of the discovery period, literally the last day, the afternoon that we finished the last deposition, they amended their complaint to allege new misrepresentation claims based on facts they alleged in their original complaint. All the facts were alleged in the original complaint. The lower court dismissed these 12th hour misrepresentation claims, holding that the IDSA guidelines express only medical opinions and do not set forth statements of fact that could support misrepresentation claims. Your Honor, the lower court got it exactly right and this Court should affirm. The legal principle is not in dispute. Medical opinions are not subject to misrepresentation claims. They're not statements of fact because they're based on scientific research and they're subject to constant revision based on new research, new discoveries, and also because they are directed to doctors who understand that process. Your Honors, the First Amendment protects this scientific debate which is essential to the development of medical diagnosis and treatment. This Court noted in Eastman when it was distinguishing between commercial speech, which is not protected, and academic debate, which is protected, quote, the First Amendment ensures a robust discourse in the pages of academic journals. Here... Does it depend on the forum in which the statement appears? It depends on the statements and it can depend on the forum. It doesn't have to appear in a journal these days. I mean, I'm wary of a holding from a court that would say, if the statement is scientific, then therefore it's insulated from any sort of cause of action because goodness knows there are plenty of scientific statements that are rocketing around the internet right now that they're not really scientific statements. But this, as I understand it, this is... These statements appear in the context of an academic journal. I mean, I'm not sure how to characterize it. Your Honor, they are in an academic journal. Clinical Infectious Diseases, you can see they link to the actual journal. It's the leading journal of infectious diseases. That's where they were published in 2006. That's where you can still find them. That's an academic journal. I'm just wondering... I'm sorry, Your Honor. Have they ever been updated? Your Honor, they were just recently updated and it took them like five years. They started in 2015 and they came out with an update, I think it was 2020. It might have been 2021. And they have been updated and it was a very long and drawn out process. And you can find the update on the internet and in their journal. That has been done, Your Honor. Not only the forum, but does it depend on who the audience is for the statement? Absolutely, Your Honor. And here, the audience, it's, I think, undisputed. I don't think plaintiffs dispute this. The audience are treating physicians. The guidelines themselves say they are intended for the treating physician to use as a tool in diagnosing and treating the patient. They're not binding. It's just one tool of many. And the guidelines make super clear, and I think doctors understand this and that other courts have held as a matter of law, that it's just one tool. And the plaintiffs acknowledge in their complaint that doctors realize there's other guidelines. Your Honor, they cite to the guidelines that they point out allow for treatment for chronic Lyme, for more flexible treatment, et cetera. It's the other side of the debate. So, Your Honor, you're right. The context absolutely matters. The audience matters. And here, based on this Court's decision in Eastman, the Second Circuit in Oney, the Third Circuit in Passera, where the statements are made to physicians and scientists as part of a debate, they're protected. So, Your Honor, the plaintiffs themselves acknowledge that the guidelines are part of an ongoing scientific debate. Even in their opening brief, they say there's disagreement or controversy concerning chronic Lyme disease. That's page 32. Many times in their complaint, they refer to the medical and scientific debate. At paragraph 58, they talk about what the New York State Legislature did, and they quote from it, considerable scientific controversy surrounds a diagnosis and treatment of Lyme disease. And they further quote from it, where they characterize that as a debate. That's their words, Your Honor, debate. They allege, as I mentioned, that other doctors follow other guidelines. It's from the Lyme, International Lyme and Associated Diseases Society, called ILADS. That's referred to in their debate. That's another medical society. They have their own Lyme disease guidelines. Plaintiffs themselves alleged, in their very first complaint, that doctors can go to those guidelines, and those guidelines take the other side of the debate. That's their allegation at paragraph 113. So your friend on the other side relies on the Eastman case from our circuit. Are you able to distinguish that case? Your Honor, I think Eastman fully supports us. Eastman looks at ONI, which was decided the year before, and Eastman had in front of it a brochure that was sent to, and you're right, Your Honor, context matters and where the communication is going matters. That brochure was not sent to doctors as part of an ongoing debate. Eastman did not assess an expression of a medical opinion in an academic journal for doctors and scientists. It looked at what are the causes of action potentially if it goes outside of that, goes to consumers, potentially goes to patients. Eastman held that when you send it outside of the academic scientific debate, then it may be actionable. That's not what we have here. And it actually affirmed ONI and its finding in distinguishing what we have fit squarely within ONI and PSIRA and the distinction drawn by this Court in Eastman, and we believe that the Court should continue to follow that. Your Honor, again, everything that they've said acknowledges this debate. The guidelines themselves, which are incorporated into the complaint, also show that there's a debate. They're clearly directed to the medical scientific community. They make clear that they're directed to physicians. They should consider that. That's page one of the guidelines, quote, intended for use by health care providers. And as we've discussed, they make clear that these guidelines don't fully account for individual variation, and I think doctors understand this. But the guidelines say it. I think doctors know this, quote. I'm afraid to make of the plaintiff's allegations that these guidelines are effectively binding on doctors because they can't depart from them. Under Iqbal, Your Honor, I don't think that that's plausible. And I also don't think it actually matters. If you have a situation where guidelines somehow become so established that everybody does follow them, I don't think that if something new comes along, that plaintiffs should be able to argue, oh, those are, you know, somehow now false, and because everybody follows them. I think the question is, are they still part of an ongoing academic or scientific debate, which Oney, Passira, and I think this Court has affirmed, scientific or medical debates by their very nature, as those cases point out, are subject to change. New evidence can always come along. New drugs can come along. New treatments can come along. If you allow these misrepresentation claims, very dangerous to quash that debate. Your Honor, even when discussing chronic Lyme disease, the key issue here, the guidelines state there's an ongoing medical debate and a controversy, and they refer to considerable confusion and controversy over the frequency and cause of the process, and even over its existence. That's at the record in the guidelines at 6029. And, Your Honor, the guidelines themselves, all over the place, express only opinions, not actionable facts, within the ongoing debate and controversy. First, guidelines, these guidelines, I think all guidelines, they review the available studies regarding Lyme disease. That's what guidelines do. They don't do their own original research. And the studies themselves that sit under the guidelines are medical opinions that are protected. And the guidelines then make recommendations based on how the authors assess the underlying studies. That's what these guidelines do, Your Honor. The guidelines actually grade the strength of each recommendation they make. They give it a grade, A, B, C, D, or E, and they analyze the studies that underlie each recommendation, and they give those studies, the evidence, a grade of 1, 2, or 3, based on the quality of the evidence. That entire chart is on the second page of the guidelines. That's in the record at 6003. These gradings are all over the guidelines, Your Honor. I'll just cite one, which is also on that same page, 6003. So this is very simple. After a recognized tick bite, the guidelines recommend a single dose of oral antibiotics. They grade that recommendation, B, 1. It's a moderately strong recommendation, and they think the evidence is the strongest evidence supported by placebo-controlled studies. It's hard to imagine something that's more opinion, medical opinion, than that. Actually, that sounds the most close to a fact to me. Well, Your Honor, I believe that... In the scientific world, if you've had the medical world, if you've had the placebo-controlled studies, that, you know, depending on the confidence level, that's very strong. Doctors may argue that, yeah, that's kind of a settled thing, because it is based on that study, but I think the law is... She doesn't focus on that. She focuses on the testing. The testing? Yes. Yeah. Your Honor, with respect to the testing, this is where, unfortunately, the plaintiffs misread the guidelines. I believe she said that the guidelines require a positive test to diagnose Lyme disease. That is absolutely not the case. Let me just, if you don't mind, flip to where that is. Yeah. They allege, in their complaint, that the two-tier test is required. The guidelines themselves say the two-tier test should not be used to diagnose early Lyme disease at all. It's an antibody test. You haven't developed your antibodies once you've gotten that tick bite in the first few weeks. That's at the record 6003 and 6013. After a tick bite, quote, serologic testing is not recommended, end quote. The next page, 6014, quote, serological testing is too insensitive in the acute phase, the first two weeks of infection, to helpfully diagnose. He was talking about long-term consequences. Your Honor, I'll turn to long-term. They say for patients with chronic subjective symptoms, these are subjective symptoms, and this is what chronic Lyme disease is all about. I have a friend with chronic Lyme disease who had a lot more than subjective symptoms, but I'm not going to, I can't import that experience here. And, Your Honor, that's one of the things the guidelines discuss, is it's hard to define. In the guidelines, when they talk about what they believe is the controversy, they look at chronic Lyme disease and discuss how the studies that do address it are addressing patients that do have subjective symptoms. And that's in the guidelines, Your Honor. And they make clear that for patients with chronic subjective symptoms, that the two-tier test is actually not accurate and not recommended. At 6030, it says if serological testing for Lyme skeletal complaints without any objective manifestation of Lyme disease, the test results have a poor positive predictive value. So they don't recommend it. They do recommend testing for chronic Lyme arthritis that's long-term, where you see the inflammation. And there, at page 6023, confirmation of the diagnosis requires serological testing. But that's not an issue here, Your Honors. The dispute here, the debate, is what to do with chronic Lyme disease patients who have really just subjective symptoms that are hard to pinpoint. And, Your Honor, with respect to that, the guidelines, they give their medical opinion by looking at all the studies. And, Your Honor, what the authors of the guidelines are trying to do is be very careful and advise physicians about pros and cons. And it's their opinion. And the guidelines state this, that we want to be careful and we look at how solid the evidence is. And we look at the potential harm for certain treatments. We look at the potential cost for certain treatments. And it's just very important, Your Honor, to make sure that this can be a free-flowing debate in the science and the hypothetical, but I'll ask it anyway. The allegations here seem to me to be something like this. Well, sure, you say it's a debate, but these doctors, they're bought and paid for by the insurance companies or some shadowy cabal in, you know, in Lithuania or something. And so these are all lies. These are just lies. Let's say that's, I know that you would disagree with that characterization. If somebody could prove that, could you have a misrepresentation claim? Your Honor, perhaps. But here's why that's not the case here. Your Honor, they alleged that in their original complaint to support their RICO claims. They alleged that the insurance companies paid the authors of the guidelines a lot of money to write false guidelines, and they brought RICO and antitrust claims. Your Honor, after full discovery, they had no evidence of those payments. That was the exact basis of our motion for summary judgment, which was granted, which they have not appealed. Your Honor, in this case, that can't be, it's not even, it can't be a plausible allegation. It just can't be an allegation. And so I don't think that the brand new 12-hour misrepresentation claims can go forward at all based on that allegation. The other thing, Your Honor, is that Pesera and Oney make clear that in those cases, nobody argued, and the same as here, that the medical and scientific opinion that was put out misstated falsely a prior study. These guidelines are completely based on studies. There's no allegation anywhere in their complaint that, oh, they lied about a particular study. They knew it said that this is made of gold. I mean, they said it's made of, the study said that this substance is gold when it's, you know, it's just wood or something. They didn't, they didn't allege that at all. There's no allegation that there's any misstatement of what the studies say. It's just that they disagree with the opinions provided in the guidelines. That is the stuff of First Amendment protection. I do think that's important. I'm trying to test the boundaries of this principle. If hypothetically I were to agree with you, you know, if you're, if you're test, if you're, if you're disputing the opinions, that's one thing. If you're saying, no, you just, you know, you made of a, I don't know. I don't know what the boundaries are. You're right, but you're right, Your Honor. That's important. I mean, did anyone argue, I don't quite, I still don't quite understand the theory or support for detrimental reliance. In other words, if the theory, how can plaintiffs rely on this? Your Honor, obviously the doctor is the treating intermediary and that becomes an important thing in all the drug cases. Absolutely, Your Honor. Well, was that, I mean, that's not in the motion to dismiss. When did it come up during the litigation? The fact that they didn't allege detrimental reliance? Right. Your Honor, we, that was a basis on which we moved to dismiss. The lower court did not address it. The lower court just said, I'm going to move, I'm going to dismiss based on the, what do we call first amendment opinion privilege. I won't address that argument. The court also did not address our judicial estoppel argument, which Your Honor, I think you've written the seminal opinion on that in this court when you reversed a district court that refused to apply judicial estoppel. We did brief both of those alternative grounds. Your Honor, it's up to you whether you think you need to get to them, but there is no basis for any assertion of detrimental reliance. That's a bridge way too far to argue here that plaintiffs who absolutely admit they did not rely on the physician. They said the doctors relied on it. They said the doctors relied on it and that because the doctors relied on it and the patients were harmed, the patients can sue. That is not supported by whether it's Virginia law, New York law, or Texas law, and we believe Virginia law should apply. It's certainly not supported by Virginia law, Your Honors. Unless the court has other questions. I'm with her. Thank you. I appreciate it. Yes, Your Honor. A couple points on rebuttal. In response to the argument that it's not plausible that doctors are effectively bound by these guidelines, in response to that, I would ask why have over a dozen states then have had to pass legislation to protect doctors' ability to prescribe longer-term treatment if they feel that it's necessary? And we've alleged that in our complaint. And so, again, I think it's entirely plausible that, again, doctors are effectively bound. The legislation's been passed with respect to what issue? Doctors' ability to treat patients outside of the recommendations in the guidelines. One of the main... With respect to this particular controversy? Yes, Your Honor. With respect to the ability to treat patients with antibiotics after that initial 28-day course... For Lyme disease. For Lyme disease, yes, Your Honor. And that's in... That's not because of the doctors. That's because of the insurance, right? Yes, I think it's tied together. I think it's because of the harm that the public is suffering because of the ability to get the care. And so I think those states have recognized that. We cite in our complaint the Connecticut Attorney General investigation. It's in paragraph 58 of our complaint where we cite a number of states that have had to pass legislation. And so, again, I think that it's entirely plausible that these guidelines do have that pervasive effect. And I also want to address your concern, Judge Dungan, about creating this bright line and holding that in every instance in which a scientific statement is published in academic journal, that it's always going to be immunized from liability. That should not be the law. The court should be able to consider the fuller context. That's not what's at issue here. I mean, he's asking about the contours, but that's... We're dealing with this set of guidelines and what you alleged. I'm sorry. Can you repeat the question? I'm saying it's not an issue for us to write the outer limits of what could happen in some of the circumstances. We're looking at Schroeder's ruling on your complaint in this case based on these guidelines. Right, Your Honor. And if there's ever a case to impose liability, this is the case because of the effect that these guidelines have on the ability for chronic Lyme patients to get health care. And we're not asking this court to shut down the First Amendment, to shut down the development of science, but the First Amendment interest in ensuring a free flow of scientific ideas. Strict liability? Essentially strict liability on any kind of guidelines? Is that what you... Absolutely not, Judge Stewart. We are asking this. The standard should be when these organizations know that the information that they're publishing is false and misleading, and they know that if they publish this information in a way that's not accurate, that doesn't exercise a certain degree of care, that people are going to suffer physical harm, that that is a situation where liability should be imposed. And if the court doesn't have any further questions, it's for these reasons we ask this court. Yeah, explain to me how your client's reasonably relied. I just don't understand this. Yes, yes, Judge Jones. The reliance element of these claims, if the court finds that Texas or New York law applies, both of those states have adopted sections 310 and 311 of the restatement, which deal with misrepresentation claims involving physical harm. And under both of those provisions, there's no requirement that there be a direct relationship between the actor... Yeah, but we're talking about the medical community, and this comes up in drug cases all the time. Right, in section... Whether they, if the doctor prescribes outside the FDA guidelines or within the FDA guidelines or whatever, right? Right, right. In section 311, Your Honor, it specifically is if the court looks at the comments of that particular provision, is essentially looking at doctor's ability, where it's appropriate to impose liability for doctors exercising their judgment. And so I think those provisions apply to this... So you're saying that if your doctor, if one of the plaintiff's doctors mistreated them in reliance on the guidelines, would that be set up as, would you say... Because you're saying the guidelines misrepresent the treatment protocol. Doctor follows that treatment protocol, therefore, according to you, that doctor must have committed malpractice. No, Your Honor, I don't think it's necessarily, I don't think that if a doctor relies on the guidelines that they're necessarily committing malpractice. I think it's, what's important is, was that plaintiff able to get the care that they needed based on that doctor's reliance? And so, again, I think that there are situations where a doctor can rely on the guidelines and that's sufficient for some patients. But what's the problem is, is that there is these thousands of people who suffer from chronic Lyme where the recommendations and the guidelines aren't sufficient. And it's those people who should be able to seek redress for their injuries because of the... Maybe they ought to just go to another doctor. Well, and as we've alleged in our complaint, Your Honor, that hasn't been easy because of the pervasive... There are a lot of diseases that aren't easy to treat by the medical community nowadays, and that's for many different reasons, but anyway. Does the court have any further questions? Okay, thank you. Thank you. We stand in recess. Thank you.